MaddeN, Judge,
delivered the opinion of the court:
The plaintiff, prior to February 3, 1949, applied to the Federal Government for permission to build a bridge across the Gulf Intracoastal Waterway, near Houma, Louisiana. It submitted a map and plans showing the location of the proposed bridge as well as its structural details. The Government gave public notice to all interested persons, and held hearings on the question of whether the permission should be granted. On February 3,1949, the Chief of Engineers of the Army, and on February 4,1949, the Secretary of the Army, approved the plans. The certificate of approval said that it was granted pursuant to Title V of the General Bridge Act of 1946, section 502, 60 Stat. 847, 33 U. S. C. 525 (b). It also said that it would be null and void if construction of the bridge was not begun within one year.
On the plaintiff’s application, the Chief of Engineers and the Secretary of the Army in 1950 extended the time within which construction might be commenced to February 4,1952, and the time for completion of the bridge to February 4, 1954. In reliance upon the permit which it had been given, the plaintiff made a contract with a construction company which, on July 24,1950, commenced work on the construction of the bridge. Its work was performed under the supervision of the Army Engineers’ District Engineer at New Orleans, Louisiana.
On August 24, 1950, the District Engineer telegraphed to the plaintiff a notice that all work on the bridge should be suspended; that the District Engineer had given public notice that he was going to recommend changes in the plans. In response to this telegram the plaintiff wrote the District Engineer objecting to the proposed changes unless the Government was to pay the cost already incurred in obtaining the rights of way, and in the plaintiff’s obligations to the contractor for work already done. Over the plaintiff’s protests, the Chief of Engineers on September 12 and the Sec *717 retary of the Army on September 19,1950, signed a “second permit” granting the plaintiff permission to erect a different type of bridge at a different location. The plaintiff was then obliged to abandon all work previously done by it and its contractor, secure new rights of way for bridge approaches, move power lines and incur other expenses in addition to the increased costs created by the new type of bridge specified in the permit. The plaintiff claims to have suffered a loss of $41,383.29. The petition does not allege that the federal officials concerned acted maliciously, arbitrarily or unreasonably.
The plaintiff’s suit is based upon the theory that the permit granted to it, and later revoked, was a contract, and that its revocation was a breach of contract. The plaintiff suggests also that its suit may be one for just compensation for the taking of a property right, and thus founded upon the Fifth Amendment to the Constitution.
Congress, under its power to regulate interstate commerce, has power to legislate concerning the construction of bridges over navigable waters. Until 1884 Congress enacted no such legislation, and such bridges were built under authorizations granted by the states. 23 Stat. 133, 148. By sections 9 and 10 of the Act of August 11, 1888, 25 Stat. 424, 425, the Secretary of War was authorized to order the alteration of bridges unreasonably obstructing navigation. In cases arising under later statutes of similar import, it has been held that such orders of tne Secretary of War do not constitute a taking of the bridge owners’ property and that the United States was not obliged to compensate the owner for the cost of alteration or removal of the bridge. Hannibal Bridge Co. v. United States, 221 U. S. 194; Monongahela Bridge Co. v. United States, 216 U. S. 177; Union Bridge Co. v. United States, 204 U. S. 364.
By the Act of March 3, 1899, 30 Stat. 1151, 33 U. S. C. 401, it was for the first time required that one who proposed to erect a bridge over navigable waters first obtain the consent of Congress, and the approval of his plans by the Chief of Engineers and the Secretary of War. The Act of March 23, 1906, 34 Stat. 84, contained a similar provision, section 491 of 33 U. S. C. Both the 1899 Act (33 U. S. C. 502) and the *718 1906 Act (83 U. S. C. 494) contained provisions which, expressly authorized the Secretary of War to, after hearing, order the alteration of bridges to remove obstructions to navigation, such alteration to be made at the expense of the owner. These sections applied to bridges authorized by Congress, and the plans of which had been approved by the Chief of Engineers and the Secretary of War, as well as those which had been built under State authority, before Federal permission was required. These sections also made it a crime for the owner of a bridge to fail to make alterations ordered by the Secretary of War.
In the Act of June 21, 1940, 54 Stat. 499, 33 U. S. C. 517, Congress for the first time provided for the apportionment of costs between the owner and the Government, when bridges were ordered to be altered. But that statute applied only to railroad bridges, or to combined railroad and highway bridges. In 1952 the apportionment statute was amended to include highway bridges owned by a state. 66 Stat. 733; 33 U. S. C. 516. This amendment came after the events involved in this suit, and the plaintiff does not assert any rights under it.
In 1946 Congress in its statute “To provide for increased efficiency in the legislative branch of the Government” included Title 5, The General Bridge Act of 1946, to eliminate the necessity of a special act of Congress whenever a bridge was to be erected over navigable waters. The Act gave general consent for the erection of all bridges, the locations, plans and specifications of which should be approved by the Chief of Engineers and the Secretary of War. In section 507 of this statute, 60 Stat. 849, 33 U. S. C. 530, it was said that a part of one section of the 1899 Act, and all of the 1906 Act should not apply to bridges constructed pursuant to the 1946 Act. The permission to the plaintiff which is here involved was granted pursuant to the 1946 Act. Included, therefore, in the former provisions made inapplicable to such bridges were sections 494 and 495 of 33 U. S. C., which were sections of the 1906 Act. They contain authorization to the Secretary of War to require the removal or alteration of bridges which obstruct navigation, and provide penalties for the failure of the owner to obey such orders. *719 But the 1946 Act did not provide that section 502 of 33 U. S. C. which, as we have seen, was contained in the 1899 Act, should be inapplicable to bridges built pursuant to the Act of 1946. And section 502 also gave authority to the Secretary of the Army to order the removal of bridges which obstructed navigation, and provided criminal penalties for failure to obey such orders.
Section 511 of the 1946 Act (60 Stat. 849, 33 U. S. C. 525 note) provides as follows:
The right to alter, amend, or repeal this title is hereby expressly reserved as to any and all bridges which may be built under authority hereof.
The plaintiff urges that the insertion by Congress of this section shows that Congress was reserving to itself the drastic power of requiring the removal of bridges built pursuant to. the 1946 Act, and was depriving the Secretary of War of that power which he had had under both the 1899 and the 1906 statutes, and under still earlier statutes.
If that was the intention of Congress in 1946, it was a complete reversal of a legislative policy adhered to for many decades and embodied in many statutes. Such a reversal would have called for mention in committee reports or elsewhere in the legislative history of the 1946 Act, but there is no such mention. Indeed, the context shows that Congress did not so intend. As we have seen, both the 1899 Act and the 1906 Act empowered the Secretary of War to order the removal of bridges which obstruct navigation, and provided criminal penalties for failure to comply with such orders. There was overlapping in these provisions of the two statutes, yet both were carried in the United States Code. The 1946 Act made inapplicable to the new bridges to be constructed under it all of the eight sections of the 1906 Act, including the sections here pertinent. But as to the 1899 Act, the 1946 Act made inapplicable to the new bridges only “the provisions of the first proviso of section 9 of the Act of March 3, 1899.” Congress had both of the prior Acts before it, since they were both carried in the Code and were both named in the new statute. Apparently because of the overlapping in the two statutes, Congress chose to make only the earlier, the 1899 one, applicable to future bridges. There is no evidence here of any *720 lack of awareness by Congress of tbe effect of its legislation.
Section 511 of the 1946 Act, quoted above, was apparently inserted by Congress out of an abundance of caution to avoid any impression that Congress was authorizing the creation of vested and irrevocable interests in the location of bridges. The power reserved to Congress is unconditional, whereas the power of the Secretary is conditioned upon his finding, after notice and hearing, that there is an unreasonable obstruction to navigation.
The plaintiff points to section 502 (b) of the 1946 Act (33 U. S. C. 525 (b)) which authorizes the Chief of Engineers and the Secretary of War to impose, in the granting of bridge permits, specific conditions “relating to the maintenance and operation” of the bridge, which conditions should have the force of law. The plaintiff says that since no conditions were inserted in its first permit, its right was unconditional. But this section relates only to conditions as to the maintenance and operation of bridges, not to their removal when they unreasonably obstruct navigation. It does not overlap section 502 of U. S. C., nor suggest its implied repeal.
The plaintiff urges that the procedure prescribed by section 502 of IT. S. C. was not complied with. We find that it was. The notice was given and the hearing was held by officers of the Army Engineers, the authorized representatives of the Secretary, and the new permit to build the bridge in the changed location was signed by the Secretary. We see no departure from the statutory procedure.
In the instant case the difficulty arose from the fact that after the hearing on March 30,1948, which preceded the first permit, and before the permit was issued, the location of the proposed bridge was shifted some 546.5 feet from the location discussed at the hearing as a result of the plaintiff’s attempt to provide the additional horizontal clearance requested by the navigation interests and by the Government. As a consequence, those interested in navigating the canal did not learn of the new location until construction work was started. They protested promptly and the Government’s representative stopped the work l'easonably promptly. Notice was again given and a second hearing was held on August 21, 1950. The second permit probably placed the *721 bridge in a better location than the first one. It was unfortunate, and expensive to the plaintiff that the change was made. We think, however, that it was well within the expressly reserved powers of the Government to make it, and that no liability to the plaintiff was incurred.
The plaintiff’s petition will be dismissed.
It is so ordered.
Labamoke, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff, Department of Highways of the State of Louisiana, was created by Act 4 of the Legislature of the State of Louisiana, Regular Session 1942, to be the legal successor of the Louisiana Highway Commission which thereupon ceased to exist. The Act provided that the Department thus created “shall have and enjoy all of the rights, powers and immunities incident to corporations” including the right to contract and to sue and be sued.
The Act further provided that the functions of the Department shall be “to study, administer, construct, improve, maintain, repair and regulate the use of the State highway system of the State of Louisiana * * and endowed it with the power and authority, “either by itself or in conjunction with the United States Government or with other states or any agency thereof, to construct bridges over navigable waters in this State.”
Plaintiff’s domicile and principal office is situated in the City of Baton Rouge, Louisiana.
2. One of the highway bridges which was constructed by plaintiff was known as “Bayou DuLarge Bridge” and was located west of the City of Houma, Louisiana, across the Intracoastal Waterway, approximately 59 miles west of the Harvey Lock at the Mississippi River, which bridge, as con *722 structed pursuant to approval given by the Corps of Engineers, United States Army, is the subject of this suit.
3. The Intracoastal Waterway is a protected coastal waterway route along the Atlantic and Gulf coasts of the United States, which is navigated by commercial tows and other light-draft vessels not suited to navigating long stretches of the open Atlantic Ocean and the Gulf of Mexico. With a few gaps, the waterway now extends from Boston, Massachusetts, to the Florida Keys, and along the Gulf coast from Carrabelle, Florida, to Brownsville, Texas.
That portion of the Intracoastal Waterway lying between Florida and the Mexican border is known as the Gulf section and is sometimes referred to as the Gulf-Intracoastal Waterway. Forming part of the Waterway was Harvey Canal Lock, which was projected through the west bank levee of the Mississippi Eiver opposite New Orleans, Harvey Canal No. 1 and Harvey Canal No. 2, which were privately owned and operated.
By the Act of March 2,1919 (40 Stat. 1275,1280) authorization was given and funds were appropriated for improvement of the inland waterway from the Mississippi Eiver to the Sabine Eiver. A portion of the project adopted under this legislation provided for a waterway five feet deep and forty feet wide westward from the Mississippi Eiver, a distance of 115 miles, together with the purchase of Harvey Canal No. 1 and Harvey Canal No. 2, and a part of the Company canal.
The project also provided for a land cut of 1.8 miles in the vicinity of Houma, Louisiana, from Bayou Terrebonne to Bayou Black. By 1924 the work thus authorized had been completed except for the excavation to be done on the 1.8 miles cut at Houma, for which purpose land had already been acquired by the Parish of Terrebonne and deeded by it to the United States.
4. On April 3, 1924, there were transmitted to Congress reports by the Corps of Engineers covering examination, surveys, and recommendations for further improvement and enlargement of the Intracoastal Waterway from the Mississippi Eiver to Corpus Christi, Texas.
*723 By tbe Bivers and Harbors Bill approved March 3, 1925 (43 Stat. 1186-1187) authorization was given for improvement and enlargement of the waterway in accordance with a report and recommendation of the Corps of Engineers, U. S. Army, to provide a channel 9 feet deep and 100 feet wide on the bottom. This plan as proposed and adopted by Congress provided for a route in that section between the Mississippi Biver and Morgan City, Louisiana, which was substantially the same as the route adopted under the Act of March 2,1919, with the exception of a new by-pass around Lake Salvador, and it also included the construction of a new canal to be excavated at Houma between Bayou Terrebonne and Bayou Black for 1.8 miles as provided earlier in the Act of March 2,1919.
5. Prior to the enactment of the Act of 1925 and to the construction of that portion of the waterway south of Houma, Louisiana, between Bayou Terrebonne and Bayou Black, plaintiff’s predecessor, the Louisiana Highway Commission, which was at that time in charge of the public highway system in Louisiana, had constructed and was maintaining State Highway Boute 247 which traversed, in a general northerly and southerly direction, the proposed route of the authorized waterway improvement. State Boute 247 afforded the sole vehicular highway connection to the City of Houma, the Parish seat of Terrebonne Parish, connecting with State Highway 141 to the north of Houma.
6. Prior to July 15,1931, Mr. N. E. Lant, Bridge Engineer for the Louisiana Highway Commission, ascertained from defendant’s surveys of the proposed route of the inland waterway through Terrebonne Parish, that it appeared to be defendant’s intention to construct that portion of the waterway in the vicinity of existing State Highway 247 in such a fashion and direction as to bisect Boute 247 at a very sharp angle thereby rendering it more difficult and expensive to construct a bridge over the waterway at this point. Accordingly, on July 15,1931, Mr. Lant, on behalf of the Louisiana Highway Commission, wrote a letter to the defendant’s District Engineer, in immediate charge of the dredging work on said waterway, reading in material part as follows:
*724 We have bad a survey party mak;ng the bridge location surveys for the proposed bridges over the Intracoastal Canal at LaRose, Lockport, and Houma. Mr. Robert S. Cooper is in charge of these suiveys and he called at your office and secured alignment maps showing the alignment of the canal to be built, also securing information from your office as to the loca ion of the four bridges involved. Mr. Cooper was in our office last Saturday and was showing me the maps that you had furnished him, also information he had obtained in the field, and it appears as though the construction of these bridges will involve relocation of more highway than we had anticipated.
At the proposed crossing west oí Route 247, your canal alignment alignment at a very sharp angle this will work out in a satisfactory way alignment at this point is very tance and we believe that you shorn consideration before fixing the á Any crossing on this route will in' of highway relocation involving combined central angles of appn and also involving considerable embankment construction in swa Houma on our State crosses our highway ajnd we hardly see how manner. Our high-y good for a long dis-"d nave taken this into ignment of the canal, volve at least 3000 feet three curves having pximately 180 degrees :iew right-of-way and mpy ground.
On July 20,1931, defendant’s District Engineer responded by letter to the Louisiana Highway Qommission stating, in part, as follows:
The adopted route of the canal across Highway 247 was suggested by the people of Tecrebonne, and I understood that they worked it out after consulting your engineer. The only condition tha 11 stipulated was that there must be a straight stretch o:l canal for 800 feet on either side of the bridge so that barges would not wreck the bridge fenders. If you will re call the meeting which Governor Long attended at Houma, the map used at that meeting showed the canal route and bridge location as shown on our present map. Unless I am in error, Mr. Allen agreed to the proposed layout and gave assurance to the parish that the bridge would be constructed as shown on that map. Acting on tl is agreement, the parish proceeded to secure rights-of-way for this route, the War Department approved the route, and bids will be opened on July 28 for its construction. To make a *725 change in this route would cause indeterminate delay in the construction of the canal.
7. Under date of May 11,1931, the District Engineer advised the Louisiana Highway Commission that the securing-of rights-of-way for the Intracoastal Waterway from.New Orleans to Morgan City had progressed sufficiently to make it possible to set approximate dates for the construction of the five bridges crossing this section of the canal, and made some suggestions concerning the bridge work to be done at the various locations. The letter further advised that it was. estimated the dredges would reach the roadway at Bayou DuLarge Boad on or about August 31, 1931. Thereafter the recommended overland cut south of Houma, between Bayou Terrebonne and Bayou Black, was made. This is the section of the waterway over which the bridge now in controversy was constructed.
8. Coincidental with defendant’s cutting of Highway Boute 247, defendant granted to plaintiff’s predecessor a permit to install and operate a pontoon bridge along the alignment of Boute 247. As constructed under the permit, this bridge crossed the highway at an angle of approximately 47 degrees and provided a horizontal clearance of 75 feet. The location of this bridge, which was approximately midway between the two bends in the canal, was the most desirable place for a bridge from the standpoint of navigating the waterway. This bridge, generally known as the “Bayou DuLarge Pontoon Bridge” was temporary in nature, it being plaintiff’s intention to replace it with a permanent bridge, as soon as funds became available.
9. By 1934, there had been completed the entire authorized improvement and enlargement of the waterway from New Orleans to Galveston, Texas. The Government also had replaced the old Harvey Lock at the west entrance to the Mississippi Biver with a new lock measuring 425 feet long, 75 feet wide, and 12 feet deep at low water.
On March 21, 1934, the Chief of Engineers established a minimum horizontal clearance of 75 feet measured normal to the axis of the channel for swing and bascule bridges across the Intracoastal Waterway from New Orleans to Corpus Christi, Texas.
*726 10. By the Act of July 23, 1942 (¡>6 Stat. 703) Congress authorized the enlargement of the en ire Gulf section of the waterway to 125 feet wide by 12 feet c eep.
In carrying out this enlargement program defendant abandoned part of its previously used waterway route which had been established by way of certain natural bayous and shallow lakes. As part of the authorized improvement in the waterway, substantial new land cuts were made in order to by-pass previously used broad, shallow lakes and bays and crooked bayous, where silting and filling of the channel made maintenance costly and navigation difficult. As a result of such land cuts, and the prev iously existing Harvey Canals, that portion of the Gulf Intra< ;oastal Waterway from the Mississippi River to a point beyond Bayou DuLarge Bridge near Houma is substantially man-made, except for a short section where Bayou Barrataria is utilized.
West of this particular section, na[1] dgable bays, lakes and rivers whose dimensions are equal to! or greater than those of the authorized dimensions of the waterway continue to form an integral part of the Intracoastal Waterway; and eastward from the Mississippi Diver the waterway follows such large navigable waters as Lake Pontchartrain, Lake Borgne, the Mississippi Sound, Mobile Bay, Oyster Bay, Pensacola Bay and Santa Rose Sound.
11. At the time of, or subsequent to, the completion of the work described in the preceding paragraph, and continuing up to the date of the trial of this case, the following permanent bridges of the types described having horizontal clearances as indicated, crossed the Louisiana section of the waterway:
Horizontal Name of bridge - Type Clearance
Harvey Highway_Bascule-75 feet
Harvey Railroad_ Bascule-75 feet
Houma Town Bridge No. 1_Bascule-75 feet
Houma Town Bridge No. 2-Bascule-75 feet
South Pacific RR Bridge- Swing_85 feet
12.The waterway as constructed south of Houma going west passes under a swing bridge with a horizontal clearance of 85 feet, curves to the left and then more sharply to the right, follows a straightaway course of approximately 2800 feet and enters a second right bend. State Route 247 inter *727 sects the waterway approximately in the middle of the straightaway section between the bend on the northeast and the bend on the southwest. Use of pontoon bridge continued at this location.
In 1939 plaintiff secured from defendant a permit for the construction of a permanent bridge having a horizontal clearance of- 75 feet on the alignment of Eoute 247 to replace the pontoon bridge. Due to lack of funds, however, the bridge was not built under this permit.
13= On March 4,1948, following the enactment of the “General Bridge Act of 1946” (33 USC 525 et seq.), plaintiff’s bridge design engineer, Mr. J. B. Carter, wrote a letter to Col. John K. Hardin, District Engineer, U. S. Corps of Engineers, New Orleans, La. “Attention Permit Section,” reading in part as follows:
I transmit herewith application of the Department of Highways for approval of plans for a highway bridge to be constructed across the Intracoastal Waterway at the crossing of State Eoute No. 247, in Terre-bonne Parish, at a location on the highway approximately 2.0 miles due south of Terrebonne Parish Courthouse at Houma. This location is further identified as being on the Intracoastal Waterway (Bayou Blue— Bayou Chene Sub-division of the Mississippi Eiver to Atchafalaya Section) approximately 1.3 miles south of Houma, Louisiana. The papers and documents constituting our application are as follows:
Four (4) copies of War Department Form 92B “Application for Approval of Plans of a bridge -,” dated March 4, 1948 and signed by Mr. N. E. Lant, Chief Engineer.
Sketch sheets Nos 1, 2 and 3 on cloth, showing details of proposed highway bridge with relation to the waterway.
Six (6) blue-print copies each of sketch sheets 1, 2 and 3.
Please note that we propose to use a 320'0" through truss type steel swing span power operated, for the draw •span at this location which arrangement has been planned with the intention of using the swing span from the abandoned Eed Eiver Bridge near Monda, Louisiana, which was partly destroyed by flood waters a few years ago. We have been led to a decision to use this span because of the need to replace the temporary pon *728 toon bridge at the DuLarge crossing at an early date; and the use of the span on hand will avoid the indefinite delay in procurement of structural steel that now obtains.
Please note also that the new bridge will be constructed on a line approximately parallel to the present pontoon bridge, crossing at a distance between center lines of the existing and new structures of approximately 83.5' eastward. This is the same alignment for the permanent bridge as was approved by the War Department instrument dated July 10 and 12,1939 for this location.
14. The application forwarded by plaintiff to defendant’s District Engineer, referred to in finding 13 wag on printed form 92B prepared by defendant for use by applicants for permits to construct bridges to cross navigable waters of the United States, and for such purposes it was furnished, to plaintiff by defendant. Under paragraph 3 of defendant’s application form, plaintiff was required to supply in connection therewith “Plans of the proposed structure” in quintuplícate as follows:
(a) A map showing the proposed location, and the waterway for a distance of 1 mile above and 1 mile below, with the data necessary to enable the Chief of Engineers and the Secretary of War to determine whether the location is a proper one; also an inset sketch or a small scale map showing the general location of the bridge relative to towns in the vicinity and the position of tne waterway relative to other waterways of the region.
(b) Plan of the bridge showing the length and height of the spans; width of the draw openings; position of piers, abutments, fenders, etc. and those features which affect navigation, giving on both horizontal sections and elevations the outside structure lines separating the area left for navigation from the area occupied by the bridge, and in figures the least clearance width of openings at right angles to the axis of the channel, also the least clear heights with reference to the water surfaces as specified on the reverse side of this sheet.
On the reverse side of the application form were further instructions to applicants in addition to those on the face thereof. Under the heading “IV. Drawings” paragraph “c” entitled “Size of Sheets” it was provided that “The drawings will be on sheets 8 x 10y2 inches in size” (letter size).
*729 15. Three drawings were made by plaintiff and attached to its application in compliance with defendant’s requirements as to number of prints, size and other data.
As required by the application form sheet 1 showed the proposed location of the bridge and the waterway for a distance of more than a mile above and 1 mile below the proposed bridge location, the straight course and location and ■extent of the curvatures or bends in the waterway sought to be bridged, and the location of the existing temporary pontoon bridge. In the upper left hand corner of drawing sheet 1 there was shown in small scale the general location of the bridge relative to the town in the vicinity, and the position of the waterway in relation to Bayou Black and Bayou LaCarpe, old natural streams of the region. All information, location, course and curvatures of the Intracoastal Waterway as shown on said drawing sheet 1, was derived from certified maps prepared by the United States Coast and ■Geodetic Survey, as such maps were enlarged by photographs and traced by plaintiff on its application drawings.
Plaintiff’s drawing sheet No. 2 attached to its application showed in larger scale the Government-owned Gulf Intra-coastal Waterway right-of-way 300 feet wide and the location of the waterway midway thereof, and the proposed bridge in a closed position traversing the waterway at an .angle of 47 degrees 23 minutes to the axis of the waterway ■channel. The centerline of the proposed bridge paralleled the temporary pontoon bridge constructed under War Department Permit dated June 10, 1932 and 83.5 feet to the •eastward of the centerline of said pontoon bridge. The swing, or pivot, pier for the proposed bridge was shown on the south side of the channel with the rest pier on the opposite or north side of the channel. When in open position the full usable and navigable portion of the 75-foot channel of the waterway was available to navigation.
Sheet No. 3 of plaintiff’s drawings, comprising details of the bridge structure, in plan and elevation, showed the 75-foot clear channel provided by the waterway at the suggested bridge site, the details of the bridge and its swing and rest piers so separated as to provide between fenders a 75-foot horizontal clearance perpendicular to the axis of the channel. *730 Vertical clearances of lO'l" at low water and TO" at extreme high water were also shown.
16. Upon receipt of plaintiff’s application for approval of plans for the proposed bridge, defendant’s District Engineer, in accordance with regulations of the Department of the Army, prepared and sent to all interested parties, including State and Parish officials and navigation interests (and also posted in Post Offices) a “Notice of Public Hearing,” dated March 10, 1948, advising that there would be considered at a public hearing to be held at the Terrebonne Parish Courthouse, Houma, Louisiana, on March 30, 1948, at 10: 00 a. m., plaintiff’s application for a swing span highway bridge across the Gulf Intracoastal Waterway. The notice gave in detail the proposed location of the bridge, its length and the length of the swing span, and the proposed horizontal and vertical clearances. All interested parties were invited to be present and to express their views on the suitability and adequacy of the plans in reference to navigation and to suggest changes considered desirable. The notice further stated that while oral arguments would be heard, in the interest of accuracy all important facts and statements should be submitted in writing since the record of the hearing would be forwarded for consideration by the Department of the Army.
17. Pursuant to the notice referred to in the preceding finding, a public hearing was held at which the Executive Officer, U. S. Corps of Engineers, New Orleans District, presided. A transcribed stenographic record of the public hearing was compiled by defendant. This “Kecord of Public Hearing,” received in evidence at the trial, shows that eighty (80) persons attended. Nine (9) persons spoke or made statements. Of those present four were employees of defendant attached to the U. S. Engineers’ Office at New Orleans; five were members of the Police Jury[1] of Terre-bonne Parish; four represented the plaintiff; six represented barge line or towing interests; the remaining sixty-one present were nearby residents including farmers, railroad representatives, fishermen and local attorneys.
*731 18. Prior to the formal hearing the U. S. Corps of Engineers received a number of written protests from navigation interests. In statements made at the public hearing as well as in their written protests, navigation interests vigorously objected to the granting of a permit for a bridge with 75 feet of horizontal clearance, and stated that consideration should not be given any bridge installation across the Gulf Intracoastal Waterway with less than a minimum horizontal clearance of 100 feet.
It was the contention of the barge line operators and other navigational interests that in view of the ever increasing 9ize of barges and lengths of tows being operated by navigational interests in the waterway, the horizontal clearance at right angles to the axis of the waterway for new bridges should be 100 feet. In response, the Chief Engineer of the Department of Highways stressed the points that (1) a 75-foot horizontal clearance for bridges over the waterway was governed by the 75-foot width of the Harvey Lochs at the Mississippi River entrance of the waterway, (2) this lock width had served to establish the standard approved clearance for all bridges theretofore built across the waterway, and (3) the available bridge which the Highway Department intended to use could not be constructed to give a 100-foot, clearance at the suggested location due to the necessity of erecting the bridge at an angle to the axis of the waterway to conform to the existing road alignment.
19. At the hearing plaintiff’s Chief Engineer pointed out as significant the fact that the Highway Department proposed using a 320-foot swing span which it had available to build the proposed bridge, whereas if it had to purchase a new draw span it would probably take a year longer to build the bridge. He noted, however, that the 320-foot span placed at the proposed location 83.5 feet east of the existing pontoon bridge, and approximately the same angle, would not provide more than 75 feet of horizontal clearance. He further pointed out that while consideration had been given to officially changing the standard bridge clearance of the Intracoastal Waterway, the present approved standard was still a minimum of 75 feet, and that the Highway Depart *732 ment bad a span and wanted to use it, but it would not provide a 100-foot clearance.
The presiding officer made tbe following inquiries of plaintiff’s Chief Engineer:
* * * I think your point is very well taken; you don’t have to wait on steel. However, your request for a permit indicates that you are not putting in your bridge normal to the axis of the stream, it appears from examination of the little sketch here that if the bridge was put in normal to the axis of the stream you can get 100 feet or possibly more of horizontal clearance. What is your opinion on that? Is that generally true?
To this plaintiff replied as follows:
Mr. LaNt : That is true. The alignment of the canal, of course, would determine. When the canal was built some 15 years ago there was a highway running through at this location, before this canal was built. That highway now has been improved and there is concrete paving within a short distance of the present concrete bridge on either side without giving up any of that pavement, and it is good pavement. We would like to build on this alignment which is our old highway alignment. That can be changed, but if you change the alignment of the highway to cross the canal, you will have to abandon some of the paved road.
There is another point to keep in mind and that is that there is a curve in the canal on each side of the proposed bridge located about an equal distance and the highway alignment can be thrown to the south a short distance and get a somewhat more favorable crossing or thrown to the north and get a still more favorable crossing, but in each case, the bridge location would be closer to the curve in the canal which would be somewhat objectionable to the navigators, so it is not a very simple problem.
Prior to the conclusion of the public hearing, defendant ■requested plaintiff’s engineer to submit an estimate of the increase in cost if the proposed swing span were put in normal to the axis of the channel, or at an angle which would permit approximately 100 feet of horizontal clearance. Plaintiff’s engineer agreed to include a sketch showing the necessary re-alignment of the highway.
20. Following adjournment of the public hearing, conferences were held between representatives of plaintiff and U. S. *733 Engineer’s office at New Orleans at wbicli plaintiff was. advised that defendant was unwilling to recommend approval of a bridge having less than a 100-foot horizontal clearance. Plaintiff’s representatives expressed their willingness to modify the bridge alignment to conform to their proposed location as shown in plans accompanying plaintiff’s letter dated April 30,1948, showing a bridge having a 100-foot opening situated at a point 340 feet east of the pontoon bridge at a 60-degree angle to the axis of the waterway channel. The placement of the bridge 340 feet eastward of the pontoon bridge was necessary in order to obtain about a 1500-foot sight distance and 3-degree curves in the bridge-road approaches, a requirement dictated by Class III road classification assigned to Highway 247. Moreover, such distance from the pontoon bridge was necessary to permit the swing span for the bridge to be constructed in an open position and not interfere with the operation of the pontoon, bridge which floated open in the direction of the proposed bridge for which plaintiff sought a permit. Defendant’s representatives pointed out the desirability of keeping the-new bridge as close as possible to the center of the straightaway course between the bends in the waterway in order to-provide long straight approaches to the draw opening.
A written memorandum concerning these conferences,, dated May 27, 1948, was submitted to and considered by the District Engineer.
21. By letter of June 11,1948, defendant returned to plaintiff the drawings which accompanied plaintiff’s, original application of March 4,1948 for modification to conform with the revised alignment shown on the plan which was attached to plaintiff’s letter of April 30, 1948. Defendant’s letter, in pertinent part, is as follows:
Eecent studies of the waterway traffic and protests of navigation interests indicate that it would be inadvisable to recommend approval of plans which would provide a horizontal clearance of less than 100 feet.
A study of the plans submitted with your letter of April 30, 1948, in accordance with request made at the-public hearing,. indicates a suitable solution inasmuch as. you have provided a 100-foot clear horizontal opening. However, it is requested that you locate the swing: bridge as close to the present location of the pontoon. *734 bridge as can feasibly be done without interfering with operation of the latter.
*****
Although it would be desirable from the point of view of navigation to change the alignment of the Gulf In-tracoastal Waterway Channel in the vicinity of this bridge to run along the southeast bant of the waterway, or on the opposite side to its present location, funds are not available to accomplish the dredging that would be necessary. Consequently, only a single navigable opening will be required and that on the present channel alignment.
Your cooperation in helping us to work out the solution of a difficult and complex problem at this location is very much appreciated.
22. Plaintiff revised its original drawings to show the proposed bridge crossing the waterway at a 60-degree angle, giving 100 feet of horizontal clearance, and locating the bridge approximately 320 feet east of the existing pontoon bridge, which was somewhat closer than the proposed location on the drawing of April 30, 1948. These revised plans were transmitted to defendant by letter dated July 13,1948, which stated, in material part:
Please note that we have made the revisions in the permit drawings requested by your office, which are, (1) to provide a 100 foot clear horizontal channel for navigation, and (2) to locate the swing bridge as close to the present location of the existing pontoon bridge as can practically be done without interfering with the operation of the existing facility. Since it is proposed to use a 320' steel through truss swing span at this site which the Department already has on hand and which can be arranged to provide a 100' channel clearance, we are accepting this requirement with the additional road construction it necessitates at this crossing in view of your statement that recent studies of the waterway traffic and protests of the navigation interests indicate that it would be inadvisable to recommend approval of plans which would provide a horizontal clearance of less than 100'.
23. Following the receipt of the revised drawings and upon ■consideration of all of the factors involved, defendant’s District Engineer approved plaintiff’s application and amended *735 drawings and forwarded the same to the Chief of Engineers via the Division Engineer at Vicksburg, Miss.
At the time of the receipt by the Division Engineer of the District Engineer’s recommendations, defendant had ■under consideration the adoption of new horizontal clearances for bridges crossing the Intracoastal Waterway increasing the minimum horizontal clearances at right angles to the axis of the waterway from 75 feet to 125 feet. On or about August 12, 1948 plaintiff’s plans were returned to the District Engineer for revision to provide a minimum horizontal clearance of 125 feet in accordance with such pending recommendation.
On November 26, 1948, defendant’s District Engineer returned for revision the plans disapproved by the Division Engineer requesting that plaintiff’s bridge plans be modified to provide a bridge with not less than 125-foot horizontal -clearance between fenders measured normal to the axis of the waterway in lieu of the 100 feet previously provided.
24. On or about November 10,1948, a conference was held between plaintiff and defendant in an effort to find a solution to the difficulties which presented themselves in connection with providing an opening to meet the new minimum bridge clearance of 125 feet which had just been established by defendant. Following this conference and the receipt of the drawings referred to in the preceding paragraph, plaintiff, on December 15,1948 submitted new revised drawings with a transmittal letter which, in pertinent parts, reads as follows:
* * * in further connection with this matter, we have now revised the plans for the proposed bridge to have the structure cross the waterway at right angles to the axis of the channel.
Please note that in addition to having the structure ■cross the waterway at right angles, the revised drawings will provide a 130' clear horizontal channel for navigation. This is the maximum channel clearance that can be provided by use of the 320' steel through truss swing span which the Department already has on hand, ■and since you had requested 125' clearance it was decided to make the modifications now that would pro *736 vide the maximum clearance possible from this span, which is 130'.
*****
It is believed that our application for approval of plans for a new highway bridge at this location is now in order, and we will greatly appreciate your efforts to expedite issuance of the approval instrument since these matters of clearances have caused several months of delay, and we are now considerably behind with our promise of construction on this project to local interests.
The drawings referred to showed the new location of the center line of the proposed bridge at a point about 630 feet eastwardly of the center line of the existing pontoon bridge serving State Boute 247. The new location was far enough removed from the existing Highway 247 to permit the construction of approach roads with easy curves, thus making it possible to construct the bridge at this point at right angles or at 90 degrees to the axis of the waterway, and thus for the first time utilize the full usable length of the 320' swing span and provide a 130-foot horizontal clearance.
25. The District Engineer was of the opinion that the bridge on the location 630 feet east of the existing pontoon bridge was an undesirable obstacle to navigation because of its proximity to the bend in the waterway, but after considering the conflicting problems of navigation and highway traffic, he concluded that it was not an unreasonable obstacle. In arriving at this conclusion, he considered that the 130' horizontal clearance gave practically an effective clearance of the entire navigable depth of the waterway, that this would reduce the hazards which tows of increased dimensions had experienced in passing through 75-foot clearances and that, while no dredging was contemplated at that time, it was possible, should the need be demonstrated, to make some minor deviations in the outside of the channel to assist navigation traffic to accommodate itself.
26. By memorandum to the Chief of Engineers dated December 22,1948, defendant’s District Engineer recommended approval of plaintiff’s application of March 4,1948, together with plaintiff’s plans as revised and submitted on December 15, 1948. The memorandum, among other things, described the location of the bridge, stated the character of the struc *737 ture, gave clearance data, commented upon the nature and extent of waterway traffic, and gave the District Engineer’s views concerning the probable effect of the bridge on navigation, present and prospective.
27. No public hearing was held and no public notice was given on plaintiff’s revised plans, for the reason that the successive plans were considered as modifications of the ■original plans of March 4,1948 and that therefore no further public notice was required.
28. Defendant’s Division Engineer at Vicksburg, Mississippi, approved the action of the District Engineer, and forwarded plaintiff’s application to the Chief of Engineers.
On February 3 and 4,1949, the Chief of Engineers, and by direction, the Assistant Secretary of the Army, respectively, approved the location and plans of the bridge as recommended.
29. By letter dated February 15, 1949, the District Engineer, New Orleans, forwarded to plaintiff the instrument of approval granting to plaintiff a permit for the construction •of the bridge. The permit, in evidence, reads as follows:
Approval op Location and Plans op Bridge
Whereas by Title V of an Act of Congress approved August 2, 1946, entitled General Bridge Act of 1946 (Public Law 601 — 79th Congress) the consent of Congress was granted for the construction, maintenance, and operation of bridges and approaches thereto over the navigable waters of the United States;
And Whereas section 502 (b) of said Act provides that: “The location and plans for such bridges shall be approved by the Chief of Engineers and the Secretary of the Army before construction is commenced, and, in approving the location and plans of any bridge, they may impose any specific conditions relating to the maintenance and operation of the structure which they may deem necessary in the interest of public navigation, and the conditions so imposed shall have the force of law”;
And Whereas the State op Louisiana, Department op Highways, has submitted plans and a map of the location of a bridge to be constructed across Gulf In-tracoastal Waterway, Mississippi Biver-Atchafalaya Biver section near Houma, in the State of Louisiana;
Now Therefore, This is to certify that the location and attached plans are hereby approved by the Chief *738 of Engineers and by the Secretary of the Army, pursuant to the above-mentioned Act of Congress, subject to the following conditions:
1. The district engineer in charge of the locality within which the bridge is to be built may supervise its construction in order that said plans shall be complied with.
2. All work shall be so conducted so that the free navigation of the waterway shall not be unreasonably interfered with and the present navigable depth shaU not be impaired. The channel or channels through the structure shall be promptly cleared of all falsework, piling, or other obstructions placed therein or caused by the construction of the bridge, to the satisfaction of the said district engineer, when in his judgment the construction work has reached a point where such action should be taken, and in any case not later than ninety days after the bridge has been opened to traffic.
3. The approval hereby granted shall cease and be null and void unless the actual construction of the bridge be commenced within one year and completed within three years from the date of this instrument.
4. No deviation from the approved plans shall be made either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.
5. The construction of falsework and the driving of test piles are hereby authorized, provided that the construction thereof shall not be commenced until the plans have been submitted to and approved by the said district engineer.
6. All parts of the existing bridge at this locality, not utilized in the new structure, shall be entirely removed down to the natural bottom of the waterway and the channel cleared to the satisfaction of the said district engineer not later then ninety days after the new bridge has been opened to traffic.
7. Suitable fenders shall be constructed in accordance with plans submitted to and approved by the said district engineer prior to construction.
8. The channel under the bridge shall be kept free of water hyacinths and other aquatic vegetation (or drift) and no such vegetation (or drift) shall be allowed to accumulate against the supports or trestles of the bridge. The work shall be done by and at the expense of the bridge owner.
*739 30. Plaintiff did not commence the actual construction of the bridge within the one-year period as required by the permit, and the instrument of approval expired on February 4,1950. By letter dated February 15,1950, plaintiff advised defendant that it had not been able to commence construction within the time limited, and applied for reinstatement and extension of the original approval for the same period of time as initially provided.
By memorandum dated February 20, 1950 to the Chief of Engineers, defendant’s District Engineer recommended the granting of plaintiff’s application for revival and extension. Such memorandum contained the following paragraph:
2. There has been no change in attendant circumstances since approval of the plans of the bridge to warrant giving notice of application to navigation interests and others likely to be interested. The report of the District Engineer, by 1st Indorsement dated December 22, 1948, on application for approval of plans of the bridge, is applicable to present conditions.
The original instrument of approval was revived, and the time for commencement and completion of the structure was extended by approval of the Acting Chief of Engineers on March 15,1950, and by direction of the Assistant Secretary of the Army on March 20,1950.
No public notice of plaintiff’s application for revival and extension was given.
31. Feeling secure in its right to construct its bridge across the Gulf Intracoastal Waterway at the location and in accordance with the plans and drawings which were a part of its permit dated February 3 and 4,1949, as revived, plaintiff made surveys and soil bearing tests at the permit bridge site, and prepared scaled construction drawings for its bridge. Thereafter, plaintiff issued invitations for bids for the construction involved. Texas Construction Company of Dallas, Texas, was the lowest bidder and plaintiff entered into a written contract with that firm on May 2,1950, whereby, in consideration of the payment by plaintiff of certain unit and lump sum prices specified in the contract, which as revised by a supplemental contract dated October 24,1950, was to cost a grand total of $483,604.16, the contractor agreed *740 to provide and furnish, all material, equipment and labor, ■and perform the work required to build and complete to the satisfaction of the Chief Engineer of the Department of Highways, the Bayou DuLarge Bridge (as the bridge is commonly known) across the Intracoastal Waterway, Terre-bonne Parish, including .746 mile of grading, shell base course, concrete pavement, and I-beam approach spans. The contractor also agreed to remove, dismantle, haul, re-erect and convert an old unused bridge at Monda, Avoyeles Parish, Louisiana, into a motored swing span, all in accordance with Department of Highways plans and specifications (a part of the bid data). The bid data plans and specifications were made a part of the contract.
32. Performance of the work called for by the contract with Texas Construction Company was to commence within 10 days following notice to proceed with the work, the work to be completed within 300 contract days. On May 15, 1950 plaintiff gave the contractor notice to proceed. After preliminary work plaintiff’s contractor commenced the work July 24, 1950 at the approved Bayou DuLarge Bridge Site, giving to defendant, in writing, notice prior to commencement of the work as called for by permits issued by defendant.
The contract contained certain Special Provisions, including the following:
Liability eor Losses by Acts oe’ the Federal GOVERNMENT:
It is distinctly understood and agreed by the parties to this contract that the Department shall not be liable for any loss or damage suffered by the contractor arising out of the interruption or cessation of work under this contract or for any loss suffered by the contractor in the performance of his obligations under this contract resulting from any order or act of any official or agency of the United States Government, provided, however, that nothing herein 9hall be construed as voiding any of the provisions of the Special Provision entitled “Adjustment for Changes in Common Carrier Bates”.
33. Plaintiff contracted with the South Louisiana Cooperative (BEA) to move the overhead electric lines crossing the waterway at the old pontoon bridge and reinstall them *741 at the new bridge site. Between July 24 and August 24, 1950, plaintiff’s bridge contractor drove test piles, constructed a cofferdam for the swing pier of the bridge, cleared the right-of-way for the connecting roads, performed grading on said right-of-way and did other miscellaneous work in prosecution of the work called for by its contract with plaintiff. The relocation of the overhead electric power lines was completed within this period.
34. On or about August 7,1950, one of the tugboat captains of the Coyle Lines, Inc., reported to the president of his barge line the location of the construction which was then in progress. After satisfying himself that the information which he had with respect to the location of the bridge was correct, said officer of the barge line called the representative of the American Waterways Operators, Inc., of which association his company was a member, stating that the bridge was in a dangerous location from the standpoint of navigation and requesting that action be taken to determine what could be done about the matter. As a result of this conversation, the association sent a letter dated August 7,1950, to defendant’s New Orleans office, which stated as follows:
Reference is made to my telephone conversation with Captain A. L. Jeanfreau today concerning the application of the Louisiana Highway Department for the construction of a swing span highway bridge across the Gulf-Intracoastal Waterway near Houma, Louisiana, approximately 58.9 miles west of Harvey Lock. This application was considered at a Public Hearing in Houma, Louisiana on March 30,1948.
The location of the bridge considered at the hearing was at a point about 83.5 feet east of the existing pontoon bridge, whereas it has been brought to our attention that test piles are being driven at a point considerably eastward of the proposed site. This places the bridge pier in the waterway near a very bad bend and would constitute a very serious menace to navigation.
It will be appreciated if you will handle this matter with the Highway Department with a view of baiting any further work with respect to the location of this bridge pier until such time as the matter can be discussed with navigation interests.
35. Following the telephone message referred to in the foregoing letter defendant’s District Engineer directed bis *742 subordinates to visit the site and report their observations. When such reports had been made and after the District Engineer had conferred with his navigation advisers, permit, operations and legal personnel, he telephoned plaintiff’s Chief Engineer sometime between August 8 and 10, 1950, advising him of the protests which had been received, of the fact that the objections appeared to have merit and of the District Engineer’s intention to issue a notice for a public hearing.
In this conversation plaintiff was urged to suspend the work on the bridge in order to minimize pecuniary losses pending consideration of the objections of the American Waterways Operators, Inc., but, without assurance of a recovery of the loss which would be incurred by such suspension, plaintiff declined to order suspension of the work without an official “stop order” from defendant.
36. On August 11,1950, defendant’s District Engineer gave notice to all interested parties of a public hearing to be held on August 21, 1950, in New Orleans, Louisiana, to consider modifications to the site of the highway bridge (DuLarge Bridge) crossing the Gulf Intracoastal Waterway, in view of the protests by navigation interests that this bridge as located constituted a severe hazard to navigation. The notice stated in part:
The location of the bridge, as well as the channel modification at the bridge site to be presented for consideration at the hearing, is shown on the attached sketch and is as follows:
The bridge is to remain in its presently planned location, but the channel of the waterway is to be widened along the southeast bank to provide an additional navigable opening. It will be dredged to a depth of 12 feet over a bottom width of 125 feet.
This hearing is not to be limited to consideration of the plan shown on the attached sketch, and other suggestions and ideas may be considered covering modification of the bridge site which will aid safe navigation through the drawspan.
The sketch attached to the Notice of Public Hearing was prepared by the New Orleans Office of the Corps of Engineers. It showed the bridge in its location, with a new ease *743 ment channel 125 feet wide and 12 feet deep dredged out of the south bank of the waterway, along the entire length of the straightaway, from a point well into the easterly curve, past the bridge site and the pontoon bridge, to a point beyond the westerly curve. If such dredging were done the pivot pier of the bridge would then be in the middle of two approximately equal navigable channels.
The proposal of the District Engineer had been evolved in conferences between representatives of plaintiff and defendant, and it was considered a possible solution of the difficulty by leaving the bridge at its present' location while affording reduction in the hazard complained of by the navigation interests.
37. On August 21,1950, a public hearing was held pursuant to the aforesaid notice, which hearing was attended by representatives of plaintiff, defendant, navigation interests, the Police Jury, and others. Defendant’s District Engineer presided at the meeting, and a stenographic recording of the proceedings was made. The presiding officer stated that Sec. 502, Title 33, U. S. C. gives authority to the Secretary of War to order alterations or removal of existing bridges considered to be an unreasonable obstruction to free navigation.
There were revealed at the hearing a number of contingencies in connection with the plan which could defeat its acceptability. The navigation interests were opposed to the plan and insisted that the bridge site should be moved westerly so as to place it farther distant from the bend in the waterway; plaintiff was unwilling to bear the cost of maintaining the additional fender system made necessary without contribution by the local Parish; the local Parish authorities were unwilling to increase the contribution which already had been made for the construction of the bridge, and plaintiff protested against any change in location, calling attention to its having received a permit from defendant and, relying on it, the bridge work had been commenced under contract. Also, there was the question of whether Federal funds would be made available for the construction of the additional channel. The meeting was adjourned without any statement by defendant’s District Engineer as to- *744 wbat recommendations be intended to make to the Chief of Engineers and the Secretary of the Army.
38. The natural difficulties of navigation of the section of the waterway traversed in approaching the site of the proposed bridge from the east are as follows:
The course of the waterway westerly along the south side of the City of Houma passes under the railroad’s swing bridge, then curves to the left, and after a short distance curves sharply to the right, and becomes a straight course past the site here involved, after which it again curves to the right. The course of the waterway between the railroad bridge and the proposed location of the new bridge may be described as an “S”.
Tows are made up of a tug boat with barges on a hawser, or of the so-called “pusher” type (barges pushed by a tug). There is no control on the barge and the entire tow must be controlled by or with the tug. As a navigator of a tow going west on the waterway makes the first, or left, turn, after passing under the railroad bridge, the barges often strike the north, or right, bank of the waterway. This impact, as the tow proceeds, has a tendency to throw the barges into the left, or south, bank as the nest, or right, turn is negotiated. This latter curve in the waterway at the approach to the bridge has been widened by the striking or scouring of barges against the bank. Having negotiated the “S” the barges must then be maneuvered into line to go through the bridge opening within the space available between the last bend or curve and the bridge. (
39. On August 23,1950, the District Engineer issued a notice addressed “To Whom It May CONCERN,” the pertinent parts of which read as follows:
In view of the protests by navigation interests relative to the location of a new swing span highway bridge, construction of which has been started across the Gulf Intracoastal Waterway, as a replacement for the present pontoon bridge (DuLarge Bridge, Highway 247) a public hearing was held 21 August 1950.
As a result of that hearing and informal conferences with the interests involved, it is proposed to recommend that the permit be modified to change the location from that now authorized by the permit, which was approximately 630 feet east of the present pontoon bridge, to a *745 new location approximately 430 feet east of the pontoon bridge, to provide that the pivot pier be on the north side of the waterway and to provide that the bridge be installed at an angle in such manner as to provide not less than 122 feet horizontal clearance. These modifications together with such dredging as may be necessary in the light of the bend east of the bridge location will provide a 1,200-foot straightaway approach for navigation.
ifc ^ ❖ # ❖
Any comment by interested or affected parties should be made in quadruplicate to this office not later than 30 August 1950.
40. On August 24, 1950, the District Engineer sent the following telegram to plaintiff:
REFERENCE IS MADE TO OTJR CONEERENCES AND THE PUBLIC HEARING CONDUCTED IN NEW ORLEANS, LOUISIANA TWENTY FIRST AUGUST IN CONNECTION WITH THE LOCATION OE THE SWING SPAN HIGHWAY BRIDGE NOW UNDER CONSTRUCTION FOR THE LOUISIANA DEPARTMENT OF HIGHWAYS ACROSS THE GULF INTRACOASTAL WATERWAY AT MILE 59.8 WEST OF HARVEY NEAR HOUMA LOUISIANA. I HAVE ISSUED A NOTICE TO THE PUBLIC ON THE SUBJECT DATED 23 AUGUST STATING THAT I PROPOSED TO RECOMMEND THAT THE PERMIT BE MODIFIED TO PROVIDE FOR CHANGES CONFORMING TO THE PLAN DEVELOPED. IN YOUR OFFICE WITH MR. COBB OE THIS DISTRICT ON 22 AUGUST. ACCORDINGLY, YOU ARE NOTIFIED THAT WORK AT THE PRESENT LOCATION SHOULD BE SUSPENDED IMMEDIATELY AND NO WORK AT THE NEW PROPOSED SITE INITIATED PENDING ACTION ON MY RECOMMENDATION.
On the same day plaintiff notified its contractor, Texas Construction Company, to suspend work on the bridge immediately, and that suspension was to continue pending action by the War Department regarding a change in location of the bridge.
41. Plaintiff sent to defendant a letter dated August 28, 1950 in which it referred to the proposed modification of the bridge plans as stated in the notice of August 23, 1950, and continued in material part as follows:
* * * It is my understanding that your position is that the costs occasioned by the above-mentioned proposed modification of the permit are to be borne by this Department.
*746 This Department objects strenuously to that proposed modification unless the United States obligates itself to pay this Department all expenses incurred by this Department as a result of such modification, for the folio wing reasons:
The bridge in question is now under construction under and in accordance with a permit therefore issued by the Chief of Engineers and the Secretary of the Army. It is being constructed by this Department by a contractor who has entered into a contract with this Department to construct it. That contractor has prepared to construct the bridge in accordance with that permit and has done considerable work on its construction.
If the proposed modification of the permit is adopted, the above-mentioned contractor will be entitled to be paid by this Department for the work he has already done on the bridge, which will be practically a total loss to this Department, and also such damage and loss of profits as the contractor may sustain as a result of such modification.
The proposed modification will also cause the Department to have to secure additional rights-of-way for the approaches to the bridge at considerable expense.
If the United States does not undertake to reimburse this Department for those expenses occasioned by the proposed modification, and you are correct in your position that it does not have to do so, and the modification is adopted, this Department will either have to construct a bridge under the modified permit at considerable additional expense or will have to abandon the project.
The bridge is now being constructed, as you know, under an arrangement between this Department and the Parish of Terrebonne by which that Parish is putting into it certain funds it controls. Should the modification be adopted this Department will have to call upon that Parish to put more funds into the project.
42. By letter dated August 30,1950,. the American Waterways Operators, Inc., advised defendant that the members of the association after explanation and full discussion of the matter did not object to the construction of the bridg'e as outlined in the notice of August 23, 1950.
43. On September 1,1950, the District Engineer submitted a memorandum to the Chief of Engineers which contained an appropriate review of the earlier action taken and of *747 the more recent developments, together with a recommendation that the existing permit be modified in accordance with a new set of plans accompanying the memorandum.
On September 12 and 19, 1950, these revised plans were approved by the Chief of Engineers and the Secretary of the Army respectively, and a new instrument of approval issued.
Defendant’s District Engineer advised plaintiff of the ■above action in a letter dated September 25, 1950, which reads as follows:
In view .of the protests by navigation interests that the Bayou DuLarge Bridge, authorized by permit dated 3 and 4 February 1949 and instrument dated 15 and 20 March 1950 extending the time for commencement and completion, is obstructive to navigation, I recommended to higher authority that these instruments be modified as follows:
a. That the bridge be moved in a westerly direction to a point approximately 430 feet easterly of the present pontoon bridge.
b. That the pivot pier be moved from the south to the north bank of the waterway.
c. That the horizontal clearance be reduced from 130 to a minimum of 122.8 feet.
Inclosed herewith for your guidance in planning work under the revised plans, is set of prints of the plans forwarded with my recommendation.
By telegram dated 20 September 1950, higher authority advised the revised plans were approved as of September 19,1950.
As soon as the revised instrument is received, it will be forwarded to you for compliance.
The revised instrument was forwarded to plaintiff on September 28,1950.
44. In reply to the defendant’s letter of September 25,1950, aforesaid, plaintiff wrote to the District Engineer on September 28,1950 and stated, in part:
* * * It is our further understanding that we are being advised to change the location if we wish to proceed, to the location as shown on the sketch sheets attached to your letter of September 25.
*748 We have previously objected to changing the location of this bridge if we were required to make the change at our expense in accordance with our letter to you of August 2'8. We now request that we be informed whether or not the Corps of Engineers of the U. S. Army will reimburse this Department for the expense involved in making this change.
* $ $ $ $
The District Engineer responded to the above in a letter dated September 29,1950, which, in pertinent part, reads as follows:
Ü: * ¡Ü * *
This will confirm the statements I have made to you orally that there was no administrative method whereby the Corps of Engineers could reimburse the Department of Highways for the cost of accomplishing the proposed changes.
Under existing law (33 U. S. Code 502) the cost of altering highway bridges to render navigation through or under them reasonably free, easy, and unobstructive, must be borne by the bridge owners, there being no legal basis for reimbursing the Highway Department for the extra cost involved in the change of location.
45. Following receipt of the revised permit accompanying defendant’s letter of September 28, 1950, plaintiff surveyed the new bridge site, acquired and surveyed new rights-of-way, prepared revised bridge structural drawings to conform to the new conditions existing at the new site, and thereafter negotiated a new contract with Texas Construction Company.
46. On October 24, 1950, plaintiff entered into a written supplemental contract with Texas Construction Company for construction of the Route 247 Bayou DuLarge bridge across the Intracoastal Waterway at the changed location based upon revised drawings. Plaintiff and its contractor agreed that the terms of the original contract dated May 2, 1950, would remain in full force and effect except as modified by Articles II to XII inclusive, of the supplemental contract, which modifications provided:
Article II. The revised plans signed by the Department’s Chief Engineer and Bridge Design Engineer on October 10, 1950, shall supersede the original plans *749 signed by said Department’s Engineers on November 1,1949.
Article III. The Department will pay tlie Contractor for the quantities of items in place or work actually performed at the original proposed bridge site at the respective unit prices applying to such items prior to the modification of said contract by this supplemental agreement. The actual quantities of such items in place at the old site shall be determined by the Department’s Project Engineer.
Article IV. For all materials intended for use on the project at the original site already delivered or ordered and for which orders cannot be cancelled and which materials cannot be used in the project at the new site, the Department will take over such materials and pay the Contractor the actual cost thereof including such transportation charges as the Contractor may have paid. For materials, if any, not already delivered and for which orders cannot be cancelled and which cannot be used in the project at the new location, the Contractor shall issue such reconsignment orders for same as the Department may direct. The Contractor shall furnish receipted bills for all materials taken over by the Department from the Contractor.
Article V. The Contractor shall complete the loading of the one test pile in the pivot pier for which the Contractor has already made preparations to do and shall receive payment therefor at the contract unit price therefor. The work may be done during the period that all other work on the project is suspended, and if done during such period, no charge against the contract time will be made because of such work.
Article VI. The Department will reimburse the Contractor at the actual rental rate per month or fraction thereof, the Contractor is obliged to pay for a rented barge used to transport the steel swing span and other materials salvaged from the bridge over Fed Fiver at Monda, Avoyeles Parish, Louisiana. Feimbursement shall also include incidental expenses attributable to the use of the barge. The period for which reimbursement will be made to the Contractor by the Department shall commence upon arrival of the loaded barge at the new site of the bridge on or after August 24,1950, and shall continue until the date the Department provides a suitable place for the storage of the materials so transported.’ The Contractor shall furnish the Department actual receipted bills in support of his claim for reimbursement *750 for barge rental and other incidental expenses attributable thereto.
Article VIL The Department will reimburse the Contractor for rental paid by the Contractor to an approved Subcontractor engaged to drive piles, a daily rental on a six-day week basis for holding available a pile driver rig fully equipped with auxiliary equipment. This reimbursement shall be limited to the actual rental rate and such incidental expenses as are actually paid by the Contractor to said Subcontractor as witnessed by receipted bills to be furnished the Department. The time for which reimbursement will be made by the Department to the Contractor will be such period of time during the period of time the work is officially suspended by the Department that the equipment has been held available and was not used on other work. The claim presented by the Contractor for reimbursement shall be accompanied by a statement to the effect that the said equipment has been held available during the period for which the claim is made and that said equipment has not been used on other work during the period for which the claim is presented.
Article VIII. With the exception of a claim which may be filed against the Contractor by the Delta Construction and Equipment Company arising out of the suspension of work on August 23,1950 and/or change in location of State Project No. 245-03-04 for which no provision for payment, if any, has been made and such other claims as are specifically mentioned in this supplemental agreement and for which payment will be made by the Department, the Contractor agrees to absorb such claims, if any, and to indemnify and save harmless the Department against any loss or damage arising out of or occasioned by the filing of claims based on or attributable to the suspension of work on August 23, 1950 and/or to the change in location of the project by Subcontractors or others who may file claim against the Contractor. The department agrees to accept and reimburse the Contractor for any legitimate claim the Contractor may have to pay the Delta Construction and Equipment Company because of the suspension of work on August 23, 1950 and/or change in location of the project but only in such amount as the Department can be held legally responsible for. The Contractor in consideration of this supplemental agreement agrees to make no other claims for loss or damage against the Department because of the suspension of work on August 23,1950 or because of the change in location of *751 the project, Condition 5 of Page 2 of the Contractor’s letter of October 6, 1950, attached, to the contrary notwithstanding.
Aeticle IX. The Department will reimburse the Contractor for all overhead expense occasioned by the suspension of work August 23,1950 and for maintaining an office at the site of the project during the period the work is suspended, including the salaries of the Superintendent and such other personnel of his organization as the Contractor usually retains during periods of relative inactivity.
Article X. Because of the large reduction in contract quantities of certain pay items and changed working conditions due to the change in location and certain changes in design of the bridge, the Contractor is entitled to an increase in unit prices applying to certain items and an additional item, and the revised contract unit prices to apply to said items for the work accomplished at the new location of the project are hereby established as follows:
Item No. Description of Item Unit Unit prices
Original Revised
5-2.._. Dismantling, Hauling and Erection of 320' Swing Span. Lump— $43,450.00 $49,950.00
1-4-3— Muck Excavation___ Cu. Yd_. 1.20 2.00
1-4-4... Borrow Excavation_ Cu. Yd.. .65 1.10
3-4-1... Portland cement Concrete Pavement, Type B (8" uniform). Sd. Yd... 4.80 6.26
4-5-1... Class “A” concrete. Cu. Yd_. 60.00 70.00
4-5-lx.. Class “A” concrete (Piers and Bents only). Cu. Yd.. 48.00 60.00
4r-6-3— Class “S” concrete...__ Ou. Yd-34.60 37.00
6-31-1.. Removing one (1) Sited. Unit_ 50.00
The above revised unit prices are the prices the Contractor has offered to perform said items for as witnessed by the Contractor’s letter of October 6, 1950 attached hereto and made a part of this agreement and are accepted by the Department as mutually agreeable to the parties hereto.
Article XI. Because of the temporary suspension of work and the change in plans and location of the project, it is agreed that all contract time elapsed or counted up to and including August 23, 1950, the date of suspension of work, will be voided and shall not be counted against the contract time for completion of the work.
It is further agreed that the contract days established by the original contract shall remain in full force and effect and that the counting of the contract days for *752 work to be performed under the contract, as amended by this supplemental agreement, shall begin immediately as of the date of the Department’s written notice to the Contractor authorizing the full prosecution of the work under the contract as amended by this supplemental agreement and with the further provision that the revised estimated contract amount as hereinafter set forth shall be used in accordance with the specifications to calculate the contract time in lieu of the original contract amount should the amount of the final estimate paid the contractor, exclusive of work performed prior to the suspension of work August 23,1950 and amounts paid the contractor to satisfy claims issuing out of or caused by said suspension of work, exceed the revised contract amount hereinafter set forth.
Akticle XII. The revised contract amount and items as established by the supplemental agreement are as follows:
(Detailed listing of items)
* * 4$
Total contract items, Project No. 33-03-12_$24,148.38
Plus 10% for Engineering and Contingencies_ 2,414. 83
Total estimated cost, Project No. 33-03-12- 26, 563.21
* * * * *
Total contract items, Project No. 245-03-04_ 428, 653.97
Estimated amount to be paid Contractor to Take Care of Items of work at old site of bridge and to satisfy claims and other items of expense not included in revised contract amount- 23,400.00
Sub-total_ 452, 053.07
Plus 10% for Engineering and Contingencies- 45,205.39
Total estimated cost Project No. 245-03-04__ 497,259.36
Total estimated cost, Project No. 33-03-12_ 26, 563.21
Total estimated cost, Project No. 245-03-04- 497,259. 36
Grand total of both projects_ 523, 822.57
Original contract cost plus 10% for Engineering and Contingencies_ 483, 604.16
Excess cost due to suspension of work and change in location of bridge_ 40, 218.41
*753 47. On May 14, 1951, plaintiff submitted a claim to the District Engineer for $35,463.95 for expenses incurred in connection with the relocation of the Bayou DuLarge Bridge. The District Engineer returned this claim to plaintiff together with a letter dated June 12,1951, in which he wrote:
As has been previously stated orally to you, you are informed that, regardless of the question of liability, claims which may be administratively adjudicated are limited in amount to $1,000.00. Since your claim exceeds that amount, regardless of the liability, which of course I cannot recognize, it is returned herewith.
A copy of your letter and this reply is being furnished to the Chief of Engineers for his information and record.
48. The parties have stipulated and agreed that, reserving all questions of defendant’s liability therefor as a matter of law, with respect to the merits of this case and with respect to the individual items in plaintiff’s claim as elements of damage, the following are stated as the items comprising plaintiff’s claim, and the amounts set forth are not contested by defendant:
(a) Paid by plaintiff to its contractor, Texas Construction Company under Article III of the Supplemental Agreement representing the cost of the work performed by the contractor at the original site of the Bayou DuLarge Bridge in the Gulf Intracoastal Waterway, near Houma, between July 24, 1950, and August 24, 1950_$9, 775. 72
(b) Reimbursement to Texas Construction Company under Articles VI, VII, VIII, and IX of the Supplemental Agreement for the contractor’s expense during delay due to stoppage of work by the United States_ 10, 060.63
(c) Paid to Delta Equipment and Construction Company, Inc., subcontractor, under Article VIII of said Supplemental Agreement, for work performed at the original location of the bridge_ 11, 000. 00
(d) Department of Highways’ engineering expenses, and miscellaneous materials and supplies, from May 15, 1950 to date work resumed at new location on October 9,1950_ 5, 357. 71
(e) Preliminary engineering expenses of Department of Highways, due to change in location of bridge site_ 2,574.9»
*754 (f) Expense incurred, in second relocation of power lines by tbe South Louisiana Electrical Cooperative Association due to change in location of bridge site- 2,614.25
49. Additional details concerning the various items listed in the preceding finding are as follows:

Item, $9,775.7»

Clearing 4.455 acres of right-of-way at unit contract price of $240 an acre_$1,069.20
1,008.8 cu. yds. of borrow excavation at unit contract price of 65 cents per cu. yd_ 655. 72
546.6'cu. yds. of structural excavation at unit contract price of $13 per cu. yd_ 7,105. 80
Removal of 9 buildings at lump sum price_ 855.00
Moving building 45 ft. at unit contract price of $2.00 per ft- 90.00
• Total_ 9, 775. 72

Item $10,060.6$

Barge rental under Article VI of supplemental
contract_ $1, 734. 60
Amount paid Oonafax & Collins for rental of pile driver and equipment under Article VII of supplemental agreement- 1,360. 00
Paid 'Delta Equipment Co. for rentals on dragline dredge and tractor dozer under Article VII of supplemental agreement- 1, 800. 00
For overhead disbursements at site during delay- 5,166. 03
Total_ 10,060.63

Item $11,000.00

Following the above recited payments of the sums of $9,775.72 and $10,060.63 to Texas Construction Company which included the sum of $1,800.00 for subcontractor Delta Equipment & Construction Company, for rental of dragline dredge and tractor dozer, the subcontractor brought suit in the State Court against the prime contractor, Texas Construction Company, claiming additional expenditures and losses resulting from the stoppage of work at the original bridge site involving in the aggregate $44,449.98 less credit for the $1,800.00 received from plaintiff through the prime contractor. Under Article VIII of the supplemental agreement dated October 24, 1950, between plaintiff and its prime contractor, for the work at the new bridge site, plaintiff *755 bad agreed to “accept and reimburse the contractor” for such amounts as the contractor may legally be called upon to pay to the subcontractor. In the suit, Texas Construction Co. had plaintiff made party defendant. Before trial, the claim of Delta was settled through payment by plaintiff of $11,000.00 which was over and above the $1,800.00 which Delta had previously received from plaintiff through its prime contractor.

Item $3,367.71

For engineering expenses in connection with construction of its bridge at the first permit site, including field surveys, preparation of contract drawings, plaintiff expended the sum of $5,357.71 all of which was a total loss to plaintiff when its first permit was cancelled and the bridge site had to be abandoned following defendant’s stop order dated August 24, 1950.

Item $2,57198

In connection with the construction of its bridge at the changed and new location under the permit dated September 19, 1950, plaintiff incurred and paid out the sum of $2,574.98 for preliminary field surveys, revision of its bridge drawings and other engineering expense, none of which expense would have been necessary if the job had been done pursuant to the first permit granted.

Item $2,81^.25

To accommodate the connecting road approaches to the bridge first permitted and to be constructed under the original contract with the Texas Construction Company, it became necessary to relocate and rearrange certain electric power lines owned by South Louisiana Electric Cooperative Association, plaintiff agreeing to pay the actual costs involved. At a cost of $2,458.69 this relocation of power lines was accomplished prior to August 24,1950. The cancellation of the original permit by defendant rendered the relocation work at the original bridge site useless and necessitated a second relocation of the power lines to accommodate the work at the second site at a cost of $2,614.25. Plaintiff paid the South Louisiana Electric Cooperative Association the sum of $5,072.94 covering the actual cost of the two relocations. Of this amount the expenditure by. plaintiff of $2,614.25 was attributable solely to the change of the bridge site and cancellation of the first permit granted by defendant.
*756 The total of tbe items of expense detailed in this finding is $41,383.29.
CONCLUSION 0E LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Known generally as County Commissioners in many States.